# Exclusion of Medicine and Medical Supplies From Controls Under the Export Administration Act of 1979

Congress intended the exclusion in § 6(f) of the Export Administration Act of 1979 for medicine and medical supplies to be absolute, and did not intend to limit it by imposing a strict standard of human need.

The President has broad discretion to determine whether particular exports are medicines or medical supplies within the exclusion, subject only to the limitation suggested by the concept of basic human need.

November 13, 1980

## MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE PRESIDENT FOR CONSUMER AFFAIRS

This responds to your request for our opinion as to the scope of the exclusion of "medicine or medical supplies" from export controls under the Export Administration Act of 1979, Pub. L. No. 96–72, 93 Stat. 503 (1979), 50 U.S.C. App. § 2401 (Supp. III 1979). In pertinent part, the exclusion in § 6(f) of the Act reads:

> (f) Exclusion for Medicine and Medical Supplies—
>
> This section does not authorize export controls on medicine or medical supplies. It is the intent of Congress that the President not impose export controls under this section on any goods or technology if he determines that the principal effect of the export of such goods or technology would be to help meet basic human needs. This subsection shall not be construed to prohibit the President from imposing restrictions on the export of medicine or medical supplies under the International Emergency Economic Powers Act.

50 U.S.C. App. § 2405(f). You have asked whether the exclusion is limited to only those "goods or technology . . . the principal effect of which would be to help meet basic human needs"; and, if so, what is meant by the phrase "basic human needs"; and how and by whom the determinations of exclusion are to be made.

# I. The Scope of the Exclusion

Your question concerning the scope of the § 6(f) exclusion (actually, the absence of authority to impose controls) arises because there is tension between the first and second sentences of the subsection as quoted above. The first sentence uses the phrase "medicine or medical supplies" in describing the goods and technology excluded from controls, while the second sentence defines the exclusion in terms of a standard of "basic human needs." Yet the Act defines neither phrase and does not otherwise indicate whether they are intended to have the same meaning. Because of this ambiguity, there are two possible readings of the effect of the two sentences together.

First, as you inquired, the second sentence could be read as limiting or further defining the first. Thus, although the first sentence seems to exclude from controls all medicine and medical supplies, the second sentence would limit the exclusion to medicine and medical supplies, the principal effect of which would be to help meet basic human needs. Alternatively, the second sentence might be read as merely explaining the basis for the absolute exclusion in the first sentence and would not impose a strict standard of human need on the exclusion. The question is not free from doubt, but we conclude that the latter interpretation is the better reading of the language of the subsection itself and is also more consistent with the sparse legislative history of the exclusion.

Initially, we note the interpretive problems that you suggested. As to the statutory language itself, the first sentence, the only operative language of the subsection, is phrased as an absolute exclusion. To read the second sentence as a limitation on this absolute exclusion would have the effect of giving greater weight to the language phrased merely as a statement of intent than to the operative language itself. Moreover, only if the standard of "basic human needs" encompasses less than all medicines and medical supplies could the question of limitation even arise; and, in the absence of definitions in the Act or the legislative history of "medicine or medical supplies" or of "basic human needs," it is not evident that the second sentence is a limitation on the first. Instead, Congress could have intended to convey its belief that all medicine and medical supplies would help meet a broadly conceived standard of basic human need. With regard to the majority of medicine and medical supplies, this belief would be supportable in fact. The possibility that there might exist some medical goods that would not be thought to meet a standard of basic human need no matter how broadly it was defined, should not prevent Congress from legislating on the basis of this presumption with regard to the entire class of goods.

There is little legislative history of § 6(f). The House version of the Export Administration Act originally contained an exclusion for food, medicine, and medical supplies. H.R. 4034, 96th Cong., 1st Sess. § 6(f) (1979) (discussed at 125 Cong. Rec. 24,034 (1979)). The House Report

accompanying the bill, however, is not helpful concerning the question of interpretation, for it merely restates the language of the bill itself. H.R. Rep. No. 200, 96th Cong., lst Sess. 20 (1979). The Senate version of the Act, S. 737, 96th Cong., 1st Sess. (1979), contained no exclusion at all. The conference committee agreed to the House version with an amendment to make the exclusion apply only to medicine and medical supplies. Again, however, the conference report does no more than state this procedural history. H.R. Rep. No. 96–482, 96th Cong., 1st Sess. 46 (1979).

The hearings before the House subcommittee considering the bill are somewhat more revealing. Again, the discussion of the exclusion was not extensive; but we believe that what little discussion there was supports our interpretation that the second sentence of the subsection is an explanation and not a limitation. As originally proposed, the exclusion in the House bill was limited to the first two sentences of what is now § 6(f). It did not provide, as the third sentence of the subsection now does, that the exclusion "shall not be construed to prohibit the President from imposing restrictions on the export of medicine or medical supplies, under the International Emergency [Economic] Powers Act," 50 U.S.C. App. 2405(f) (referring to 50 U.S.C. § 1701 (Supp. I 1977)). William A. Root, Director of the Office of East-West Trade at the Department of State, objected to the subsection as proposed because it did not explicitly recognize the President's powers under the International Emergency Economic Powers Act. But there is no indication that Director Root understood § 6(f) as proposed to be other than an absolute exclusion. In fact, it was this understanding that led to his concern about the President's emergency powers. Specifically, Director Root testified:

> Proposed section 6(g) [now § 6(f)] would exclude food, medicine, and medical supplies from export controls authorized by this act for foreign policy purposes. Normally, controls need not extend to these items. However, there may arise instances where commercial exports even of food and medicine would not be in the national interest. There would be no objection to extending to the Export Administration Act the prohibition now contained in the [International] Emergency Economic Powers Act—section 203(b)(2) of Public Law 95–223—against controlling donations of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations are in response to coercion against the proposed recipient or donor.

Extension and Revision of the Export Administration Act of 1969: Hearings and Markup on H.R. 2539 Before the Subcomm. on Interna-

tional Economic Policy and Trade of the House Comm. on Foreign Affairs, 96th Cong., 1st Sess. 648 (1979) (hereinafter cited as Hearings).

Remarks made during the markup session also support the interpretation that § 6(f) was intended to impose an absolute exclusion from controls. Representative Lagomarsino of California offered an amendment to strike the § 6(f) exclusion because he was concerned with the effect of the subsection on existing embargoes which included food, medicine, and medical supplies. But he was also concerned because he "[did] not think that we should be saying that under no circumstances under this act should we have a total solution or a total prohibition about embargoes on food, medicine, and medical supplies." Hearings at 774. Subcommittee Chairman Bingham of New York suggested that the amendment be considered in connection with an amendment proposed to eliminate the next subsection of the Act which provided that a total trade embargo was not authorized. Chairman Bingham explained:

> First of all, I think it is pretty clear this does not affect the existing embargoes against Cuba, Vietnam, Cambodia, and so on. They are authorized by other legislation. These paragraphs say this section does not authorize export controls of food, medicine, and so on. Basically it is my view that a total embargo is such an extreme measure that it ought to be specifically authorized by the Congress and not imposed by the administration, even though it may be subject to later veto by the Congress. That applies to a total embargo, and that applies to export controls on food, medicine, or medical supplies. These are extreme measures. Export controls on food and medicine are surely of the gravest importance, close to an act of economic warfare, and therefore it is my view that such action should be imposed by the Congress by law.

> *         *         *         *         *

> So leaving these two paragraphs in does not change the law. It simply clarifies the law. This does not change any existing controls on food and medicine or medical supplies. We simply say in effect that under this act the President cannot impose total embargo and he cannot impose economic controls of that character.

*Id.* at 774–75. Representative Bonker of Washington agreed:

> I would like to associate myself with the chairman's remarks, and retain for Congress the right to have full authority over controls. . . .

> . . . [T]here are many situations where we disagree totally with the political makeup of the government for

whatever reasons, but yet this does not totally preclude our humanitarian commitment. I think in Southeast Asia, for instance, the Red Cross is supplying medical assistance and certain items for relief and for humanitarian purposes. So I think that the proposed change would impose unwarranted restrictions on our humanitarian commitment, even though we may disagree totally with the political makeup of particular countries. For these reasons I would have to oppose the amendment.

*Id.* at 775.

At this point, Director Root again explained the Administration's position:

Mr. Chairman, as you know, the administration opposed both subsections (f) and (g) in testimony before your subcommittee earlier this month, largely for the reasons which Mr. Lagomarsino presented. With respect to subsection 6(f) we did indicate, and this addresses Mr. Bonker's point on humanitarian shipments, that we could accept language which was comparable to that now appearing in the International Emergency Economic Powers Act, which would read somewhat along the following lines:

This section does not authorize export controls on donations of articles such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations are in response to coercion against the proposed recipient or donor.

*Id.* at 775. Again, it is clear that § 6(f) was understood to exclude entirely medicine and medical supplies, and, at the time, food, from controls under the Export Administration Act. The only change sought and obtained was express recognition that the President's emergency powers continued.

We recognize that our interpretation that the second sentence of § 6(f) explains but does not limit the first is not without its own difficulties. If an absolute exclusion results from the first sentence, Congress did not have to specify its intent in the second sentence. Moreover, if an absolute exclusion results, Congress did not have to specify the situation in which controls would be precluded, that is, when the principal effect of the exports would be to help meet basic human needs. But the tension noted above between the first and second sentences of § 6(f) precludes an interpretation free of all difficulties; and on balance we find that the problems with interpreting the second sentence as an explanation are less significant than are the problems

813

with interpreting it as a limitation. First, as to the consequence that the statement of intent in the second sentence is rendered superfluous, the alternative would render superfluous the first sentence or at least its seemingly absolute character. If we must choose between the two, we should choose an interpretation that preserves that operative language of the statute even though it sacrifices the language of general intent. Second, as to the consequence that the second sentence would require a determination of the principal effect of the export that is irrelevant if no controls on medicine or medical supplies are authorized, we would offer the following saving interpretation.

## II. By Whom Are the Determinations of Exclusion To Be Made

Initially, we should say in answer to your third question, namely, who is to make the determinations of exclusion, that § 6(f) confers upon the President the authority to make the determinations required under the subsection; or he may delegate his power, authority, and discretion under § 6(f) in accordance with the delegation provisions of § 4(e) of the Act, 50 U.S.C. App. § 2403(e). Because of our interpretation that § 6(f) imposes an absolute exclusion from controls on medicine and medical supplies, it remains to be discussed just what determinations § 6(f) requires or allows the President or his delegate to make.

## III. The Meaning of the Exclusion

As we have interpreted § 6(f), medicine and medical supplies are absolutely excluded from controls on the ground that they are necessary to help meet basic human needs or at least that Congress thought so. A finding that the two standards are coterminous, however, leads to the further conclusion that the discretion conferred upon the President under § 6(f), although literally phrased as the determination whether the principal effect of exports would be to help meet basic human needs, is in fact the discretion to determine whether the exports are medicines or medical supplies. This interpretation avoids so far as possible a construction of the second sentence of § 6(f) as conferring discretion that cannot be exercised while at the same time not validating the exercise of discretion where it was not intended. The interpretation has the additional benefit of changing the definitional focus from the vague concept of "help[ing to] meet basic human needs" to the more concrete categories of "medicine or medical supplies."

This brings us to your second question. In the event that we found the scope of the exclusion limited by the standard of basic human needs, you asked what was meant by that phrase. In light of our conclusion that the exclusion is not so limited, the question is no longer pertinent. Instead, the appropriate standard of reference is "medicine or medical supplies."

As noted above, the Act does not define "medicine or medical supplies"; nor does the legislative history provide any guidance, except the general humanitarian sentiments expressed. But we have previously recognized that the Act provides the President great discretion and flexibility. In the absence of a definition specifically confining this general authority, the President may utilize his authority to the utmost extent and identify the contours of the exclusion subject only to the limitations imposed by humanitarianism suggested by the concept of basic human needs.[1]

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[1] In a memorandum opinion of today's date for the Deputy Counsel to the President, we conclude that the exemption of exports from domestic standards under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 381(d)(1), and other statutes controlling hazardous substances does not preclude the imposition of export controls for foreign policy purposes. In light of that conclusion, the scope of the exclusion for "medicine or medical supplies" need not be defined by reference to the reach of regulatory authority under the Food, Drug, and Cosmetic Act. Indeed, we note that in the pursuit of health and safety under that Act, a regulatory scope significantly broader than a standard of "basic human needs" might be appropriate. [NOTE: The text of the Memorandum Opinion for the Deputy Counsel to the President immediately precedes this opinion, at p. 802. Ed.]